UNITED STATES OF AMERICA,                    CRIM. NO. 13-139 (PAM/JSM)

      Plaintiff,                              REPORT AND RECOMMENDATION

v.

MARLIN DAHL,

      Defendant.

The above matter came before the undersigned on defendant's Motion to Suppress Evidence Seized Under Authority of State-Court Issued Search Warrants [Docket No. 33]. Jeffrey S. Paulsen, Esq. appeared on behalf of the United States. Jon M. Hopeman, Esq. appeared on defendant's behalf. An evidentiary hearing was held on defendant's motion on September 9, 2013 and continued on October 7, 2013. This matter has been referred to the undersigned Magistrate Judge for a Report and Recommendation by the District Court pursuant to 28 U.S.C. § 636(b)(1)(B) and Local Rule 72.1(c).

## I.  BACKGROUND

### A.  The Indictment

Defendant Marlin Dahl was indicted June 3, 2013, on thirteen counts of failure to collect and pay federal employment taxes ("FICA") between January 1, 2007 and March 31, 2010, on the wages of individual employees of his business, Dahl Trucking. Indictment, pp. 1-3 [Docket No. 1]. According to the indictment, Dahl was improperly classifying payments to Dahl Trucking employees as "road expenses" rather than ordinary wages. Id., p. 2.

**B.**     **Defendant's Motion to Suppress Evidence**

Dahl moved to suppress evidence seized under three search warrants issued by the Minnesota state courts in Faribault County and Martin County for: Elmore Truck and Trailer ("Elmore Truck"), XXX South Highway 169, Elmore, Faribault County, Minnesota, which was searched on June 4, 2010; a garage and storage shed on the Dahl's residence at XXXX 50th Street in Granada, Martin County, Minnesota, which was searched on June 4, 2010; and Frost State Bank, 205 Main Street, Frost, Minnesota, located in Faribault County, Minnesota, which were searched on or about June 30, 2010. Gov't Ex. 1 (application and search warrant for the search at Elmore Truck); Ex. 2 (application and search warrant for the garage/shed); and Ex. 3 (application and search warrant at the Frost State Bank).

Dahl moved for suppression of all three warrants on seven grounds: (1) the affidavits of Special Agent Charles Phill of the Minnesota Bureau of Criminal Apprehension ("BCA") did not establish probable cause to believe that the items described in the warrants would be found at the premises searched; (2) Special Agent Phill's affidavits did not establish probable cause to believe that the items sought were used as a means of committing a crime or evidence to show that a crime had been committed; (3) the affidavits in support of the warrants were so devoid of probable cause that they were not saved by the good faith exception articulated in  United States v. Leon, 468 U.S. 897, 920 (1984); (4) the warrants failed to describe the places to be searched and the items to be seized with the requisite particularity, and the warrants did not name the magistrate judge to whom the return was to be made; (5) the returns and inventories showed that the agents seized the computers and servers of the company

"wholesale" and the agents did not ensure that they did not seize items outside the scope of the warrant; (6) the returns and inventories were not properly made; and (7) the warrants and inventories were not left at the scene of the search. Id., Defendant's Motion to Suppress Evidence ("Def. Suppress Mot."), [Docket No. 33] pp. 2-3.

In opposition to the motion, the Government argued that Dahl made no specific arguments in support of his allegations that the affidavits in support of the warrants did not establish probable cause. Consolidated Response of the United States to Defendant's Pre-Trial Motions ("Gov't Resp."), p. 4 [Docket No. 34]. The Government further asserted that the affidavits contained information from an informant who had personal knowledge of Dahl's failure to withhold taxes—the informant had worked for Dahl for four years and produced check stubs and payment records from Dahl that confirmed that taxes were being withheld on only approximately 45% of the informant's wages while an employee of Dahl. Id., p. 4. In light of the informant's personal knowledge, the Government contended that there was probable cause. Id. Further, even if probable cause was lacking, suppression was not required because the agents relied in good faith on the facially valid search warrants. Id., p. 5.

Regarding Dahl's arguments that the warrants failed to describe the places to be searched with particularity and that the agents seized materials outside the scope of the warrants, the Government contended that Dahl completely failed to describe either what was missing from the description of places to be searched or to describe any items that were allegedly impermissibly seized. Id. As for Dahl's complaint that the warrant did not name the judge to whom the return was to be made, the Government stated that there is no such requirement under Minnesota law. Id. Additionally, even if it was true

that the agents failed to leave copies of the warrants and inventories at the scene of the search, that failure was purely technical and does not support suppression.  Id.

This Court held an evidentiary hearing on Dahl's suppression motion.  Transcript of Criminal Motions Hearing, September 9, 2013 ("Sept. 9, 2013 Tr.") [Docket No. 39]; Transcript of Criminal Motions Hearing, October 7, 2013 ("Oct. 7, 2013 Tr.") [Docket No. 47].

### C.    Hearing Testimony

At the hearing on September 9, 2013, Special Agent Phill testified that he executed the warrant at Elmore Truck.  Sept. 9, 2013 Tr., p. 26.  To determine what items to seize, he spoke with employees at the scene and with Linda Dahl, Dahl's wife.  Id.  Linda Dahl told Special Agent Phill where the computers and paper records were located.  Id.  Special Agent Phill testified that they did not seize all of the computers, but focused on payroll computers and accounting.  Id., p. 27.  IRS computer technical expert, Donald Cheung, was also at the scene and privy to the conversations with Linda Dahl about what should be taken.  Id., p. 53.  Special Agent Phill recalled showing Linda Dahl a copy of the warrant and testified that it was standard practice to leave a copy of the warrant with the evidence receipt—he believed he did that in this case.  Id., p. 28.

Special Agent Phill further testified that Senior Special Agent Bob Nance was in charge of the warrant executed at Dahl's Granada residence.  Id., p. 29.  Special Agent Nance told Phill that he left a service copy of the warrant at the residence with a female related to the Dahls.  Id., p. 30.

Special Agent Phill admitted that while the returns on the state court warrants were to be made within 10 days, in this case he did not make the returns until 14 days

after the issuance because he mistakenly excluded weekends.  Id., p. 31-33.  Special Agent Phill also admitted that he wrote no reports in connection with any of the three warrants.  Id., p. 33.  He stated that there was some confusion regarding who would do the reports—he believed that the person taking the evidence and preparing the evidence receipt would write the report and she believed that he was writing the report.  Id., p. 33.  However, on cross-examination, Special Agent Phill admitted that he was responsible for writing the report following the service of the warrant at the Frost Bank and he did not do it, though he could not say why.  Id., p. 43.

Additionally, Special Agent Phill testified that after seizing the computers, he told Cheung what types of information to look for, such as payroll documents, employee records, tax records, and driver records.  Id., pp. 39-41.  Special Agent Phill could not recall if he provided Cheung with a copy of the warrant, but rather he gave Cheung an overview of what the BCA was looking for.  Id., p. 41.  Special Agent Phill also testified that he did not employ a "taint team" to segregate documents that might have been privileged or not within the scope of the warrant.  Id., pp. 41-42.

Regarding the seizure of the Frost Bank records, Special Agent Phill testified that he did not know why a copy of the warrant was not on file with the issuing court; he did not prepare a return describing the records that had actually been seized, nor did he seek an extension of time to return the warrant; and he was unaware of the statutory requirements for extensions of time.  Id., pp. 47-49

Linda Dahl testified that she was present at the search of Elmore Truck and that she was not given a copy of the warrant.  Id., p. 58.  Dahl was present at the garage

and storage shed seizure and told Linda Dahl that he had also not received a copy of the warrant.  Id., p. 59.

Linda Dahl testified that Elmore Truck is a separate business from Dahl Trucking, but that the two businesses were located in the same building, which housed the Elmore Truck repair shop and the Dahl Trucking offices.  Id., p. 61.  Linda Dahl stated that the agents seized Dahl Trucking records, but "as far as she knew" not Elmore Truck documents.  Id., p. 62.  Linda Dahl further testified that on the business computers there was a personal "letter here and there" and some family pictures, along with records from Elmore Truck, farm records unrelated to Elmore Truck or Dahl Trucking, and Dahl Trucking parts lists, customer lists, job bidding proposals, trucking rates, insurance and workers' compensation documents, accounts receivable and accounts payable.  Id., pp. 69-76.

Cheung testified that he was primarily responsible for determining what would be taken.  Oct. 7, 2013 Tr. p. 7.  Cheung indicated that Special Agent Phill had briefed him on the case background and what was authorized to be seized regarding the digital evidence.  Id., pp. 6-7.  However, Cheung could not recall if he reviewed the search warrant.  Id., p. 19.  Neither could Cheung recall talking to Special Agent Phill about what offices might contain material that could be seized.  Id., p. 30.  When shown the briefing sheet (Def. Ex. 7), Cheung admitted that the briefing sheet did not state the name of the business where the records were to be seized.  Id., p. 21.  Cheung recalled that it was the Dahl Trucking Company in the City of Elmore.  Id., p. 22.  Cheung could not recall if there were two businesses at that location.  Id.

Cheung testified that he decided what servers to take by determining what role the employees played at the company and then targeting the computers. Id., p. 7. Based on the information he had received, Cheung stated that he was mostly interested in payroll and accounting information. Id. After arriving at the scene, Cheung moved everyone away from the computers and systematically evaluated which computer could contain digital evidence. Id., p. 8. Cheung came across two individuals who had accounting software open on their computers, so he determined that it could be relevant. Id. Cheung also spoke with "Marty," an accountant. Id. Marty told Cheung that there was a server and everyone was to be depositing records onto the server, therefore Cheung determined that the server should be taken. Id. Cheung testified that he did not recall talking to anyone about whether there was data on the server that was beyond the scope of the warrant or whether there were records of businesses other than Dahl Trucking on the server. Id., p. 30.

Cheung indicated that the computers were taken to the BCA, where the hard drives were cloned. Id., p. 10. Cheung stated that he was led to believe that the company's records were primarily housed on the server. Id., p. 11. The entire server was imaged. Id., p. 48. Cheung found a folder called the "Company Shared Folder," which he copied and gave to an individual specializing in accounting. Id. The "Company Shared Folder" was approximately 3 gigabytes and the server held a total of 47 gigabytes. Id., p. 12.

After imaging the server, Cheung saw folders not within the scope of the warrant, but did not recall what they were or how much time he spent looking at them. Id., p. 31. Cheung provided a copy of the cloned server to the IRS and to the Minnesota

Department of Employment and Economic Development ("DEED"), though he did not have a BCA evidence receipt because he considered the clones to be working copies of the original.  Id., p. 32.  Cheung could not remember why he thought the IRS was entitled to a copy of the server.  Id., p. 33,

Paul Schwieters, a supervisor in the Unemployment Insurance Tax Audit program of DEED, also testified.  Id., pp. 51-71.  Schwieters stated that the Unemployment Insurance Program had received a tip regarding possible fraud and had taken it to the BCA, which conducts investigations for the Unemployment Insurance Program.  Id., p. 52.

Before examining the computer records, Schwieters first reviewed the paper records seized from Elmore Truck, which indicated to him that payments were being made to drivers but they were not being accounted for as wages and were being reported to DEED as "road expenses."  Id., pp. 53-55.  Schwieters then reviewed the electronic evidence, including the "Company Shared Folder" disk he had received from the BCA.  Id., pp. 55-56.  Before examining the electronic evidence, Schwieters testified that he did not examine the search warrant and, in fact, had never seen the search warrant or supporting application.  Id., p. 72.  Schwieters stated that he met with Special Agent Phill to discuss their approach to the records, but that relied on his professional discretion in examining the image of the server.  Id., p. 73.

Schwieters further testified that he did not recall opening any files that were not authorized by the search warrant.  Id., p. 61.  Schwieters stated that he did not find any purely personal information on the disk or information that was beyond the scope of the warrant.  Id., pp. 6, 67.

After extracting the data he thought was pertinent, Schwieters kept copies in folders on his own computer and made four disks of the information to give to the IRS Special Agent, Jacqueline Tschida. Id., p. 62. Schwieters stated that he searched the disk to find files germane to the investigation based on his knowledge of the investigation. Id., p. 67.

Under questioning from Dahl's attorney, Schwieters stated that he had not reviewed the search warrant or supporting application (id., p. 72); he did not use search terms to examine the cloned image of the server (id., pp. 92-93); he did not have any forensic training (id., p. 71); he did not write a report of his investigative activities (id., p. 71); DEED had no protocols for the examination of a server or computer (id., p. 73); he had not talked to Special Agent Phill or any other law-enforcement officer about what the warrant allowed officers to examine (id.); he did not talk to IRS Special Agent Tschida about what the IRS wanted. Id., p. 93. Additionally, Schwieters testified that he looked at Elmore Truck records, but he could not recall anyone telling him that the warrant did not include a review of Elmore Truck records. Id., pp. 88-89, 92. He looked at Elmore Truck records because he understood the tip involved Dahl Trucking and Elmore Truck, and that the fraud and unreported wages were specific to both businesses. Id., p. 89.

Special Agent Tschida with the IRS Criminal Investigation Division testified that she understood that Dahl Trucking and Elmore Truck were "about one and the same" and that the Elmore Truck employees were all originally employed by Dahl Trucking. Id., p. 95. The change in their employment (from Dahl Trucking to Elmore Truck) occurred at about the time of the search warrant. Id. Special Agent Tschida testified

that she received copies of the server hard drive and hard drives of the seized computer from Schwieters, but had not opened them, and no one else at the IRS has opened them.  Id., p. 96.  Additionally, she received a copy of Schwieter's analysis of the information on the computers.  Id., p. 99.

## II.  DISCUSSION

In his post-hearing brief, Dahl reviewed the various ways the BCA failured to properly execute the search warrants at Elmore Truck[1] and the Frost Bank and its flagrant disregard for the scope of the warrants.  Defendant's Memorandum in Support of Suppression ("Def. Suppress. Mem."), pp. 1-17 [Docket No. 45].  Included in the recitation of alleged missteps in the execution of the Elmore Truck warrant was Special Agent Phill's miscalculation of the ten-day deadline for the return of the warrant; Special Agent Phill's failure to write reports for any of the warrants; the failure of law enforcement to leave service copies of the warrants with Dahl; the seizure of information beyond the scope of the Elmore Truck warrant, including records from Elmore Truck, records bearing on the family's farming operations, and Dahl Trucking customer lists, trucking rates, insurance documents, worker's compensation information, accounts receivable and accounts payable; Cheung's wholesale seizure of the server and computers without regard to the scope of the warrant; Schwieters' failure to complete his searches of the computer files until months after the seizure, in violation

---

[1]    The sole focus of Dahl's argument in his post-hearing brief was on the search of the computers seized at Elmore Truck.  No argument was presented regarding any alleged deficiencies with the search and seizure of records from the garage and shed.  Having failed to raise any issues regarding this search, the Court deems any argument about it waived.  Robinson v. Bank of America, N.A., Civ. No. 11-2284 (MJD/LIB), 2013 WL 234551 at *3, n. 6 ("Generally, any issues not raised in the written submissions to the Court are considered waived.") (citations omitted)

of the ten-day period for execution described by the warrant; the failure of the warrant application to indicate that Elmore Truck and Dahl Trucking had been merged; and Cheung's failure to comply with the BCA's protocol in myriad ways;[2] Id., pp. 1-13, 16, 25. As to Schwieters' testimony that he did not look at any files he was not authorized to look at in completing his review, Dahl noted that Schwieters had not read the search warrant and "had no idea what was authorized to be searched." Id., pp. 13, 15.

Based on all of these alleged missteps, Dahl argued that the officers' conduct showed flagrant disregard for the limitations of the search warrant and, as a result, all of the evidence must be suppressed. Id., p. 19 (citing Marvin v. United States, 732 F.2d 669, 674 (8th Cir. 1984) ("flagrant disregard for the limitations of the search warrant might make an otherwise valid search an impermissible general search and thus require the suppression or return of all evidence seized during the search."). In support, Dahl contended that the warrants authorized a search only of certain Dahl Trucking documents, not Elmore Truck documents. Id., p. 19. Additionally, the warrants, read in connection with the affidavits, restricted the seizure to documents dating from 2006 to 2010, yet documents dating from 1994 were seized. Id., pp. 19-20.

Dahl maintained that the flagrant disregard doctrine applies when the officers exceed the scope of the warrant in terms of the places searched. Id., p. 21 (citing United States v. Decker, 956 F.2d 773, 779 (8th Cir. 1992)). Dahl likened the search and seizure of the computer and server to the seizure of an entire library in an effort to locate a single book. Id. By making a wholesale seizure of the computers, the officers exceeded the scope of the warrant and therefore, all of the evidence from th4e warrant

---

[2] After the hearing, the Government provided to defense counsel a copy of the BCA protocol for searching for and receiving computer evidence. Def. Ex. 8.

should be suppressed.  Id., pp. 22-23 (citing United States v. Comprehensive Drug Testing, Inc., 579 F.3d 989 (9th Cir. 2009) (affirming district court's order that all documents seized by copying a computer's drive must be returned)).

Dahl further asserted that the good faith doctrine of Leon did not apply because a Fourth Amendment violation relating to the execution of the warrant cannot be cured by the Leon good faith exception.  Id., p. 24.  Here, the execution was so flawed that all of the evidence seized must be suppressed.  Id., p. 26.

Lastly, Dahl claimed that the evidence seized from the Frost Bank must be suppressed because the supporting application did not contain probable cause, Special Agent Phill was untimely in his return, and when the return was finally made, Special Agent Phill only stated "records still being compiled at this time."  Id., p. 26.

In response to Dahl's post-hearing arguments, the Government observed that Dahl had abandoned his contention that the Elmore Truck warrant was not supported by probable cause and had instead argued only that the warrant was executed improperly because documents outside the scope of the warrant were seized.  Government's Memorandum in Opposition to Defendant's Motion to Suppress ("Gov't Opp."), p. 1 [Docket No. 48].  Yet, according to the Government, Dahl could not identify a single improperly seized document despite having access to all of the documents culled from the server.  Id.  The Government also rejected Dahl's theory that the doctrine of flagrant disregard encompassed the seizure of computer files or hard drives, noting that the agents did not search any places not authorized by the warrant.  Id., p. 7.  To the contrary, the search warrant for Elmore Truck authorized the search of "all computer hard drives or other media storage devices used by DTI employees."  Id. (quoting Gov't

Ex. 1, p. 1).  But, even assuming that some documents not relevant to the investigation or encompassed by the warrant were seized, the remedy was suppression of that evidence, not a wholesale suppression of all evidence.  Id., p. 8.  Regarding Dahl's argument that documents dating to 1994 were seized, the Government noted that attached to Dahl's brief was a list of the files on the disks that Schwieters provided to Tschida and none of the files describe any documents pre-dating 2007, nor did any of the files mention the farming operations not at issue in the criminal investigation.  Id. (citing Def. Suppress. Mem., Ex. A).

As for Dahl's argument that the officers impermissibly seized Elmore Truck records, the Government submitted that at the time of the search the investigators believed that Dahl Trucking and Elmore Truck were essentially the same entity—a reasonable belief based on a screen shot from the Dahl Trucking website used in the pre-search briefing (contained in Def. Ex. 7) that strongly suggested that Dahl Trucking and Elmore Truck were one and the same.  Id., p. 10.  Further, the companies are housed in the same location, are owned by the same persons, and use the same computers.  Id.  In fact, Elmore Truck documents were found on the "Company Shared Folder" and as Exhibit A to Dahl's brief showed, the only Elmore Truck documents copied and retained were employment and payroll documents described in the search warrant's list of items to be seized.  Id.

Regarding Dahl's challenge to the Frost Bank search, the Government contended that investigators reasonably believed that Dahl Trucking and Elmore Truck were different names for the same entity—therefore, it was reasonable to obtain bank records under either name.  Id.  The affidavit supporting the Frost Bank search stated

that Marlin Dahl benefitted from the fraud by taking a "large cut of the driver's earning[s] from the unreported check because he knew they could not complain. <u>Id.</u>, p. 11 (quoting Gov't Ex. 3, p. 3). Thus, it was reasonable to seize Dahl and Linda Dahl's bank records to see if any ill-gotten gains were to be found in their personal bank accounts. <u>Id.</u>

The Government rejected Dahl's argument that the computer search was not conducted within the ten days permitted by the warrant, stating that the computers were copied and returned six days after they were seized. <u>Id.</u>, p. 12 (citing Oct. 7, 2013 Tr., pp. 10-11). The ten-day limit applied only to seizure of the computers, and not to the completion of the analysis of the contents of the drives or servers. <u>Id.</u> (citing <u>United States v. Triumph Capital Group, Inc.</u>, 211 F.R.D. 31, 66 (D. Conn. 2002) ("neither Rule 41 nor the Fourth Amendment impose any time limitation on the government's examination of the [computer] evidence seized."). As for the delay in searching the computer evidence, the Government submitted the delay did not violate the Fourth Amendment when there is no claim that probable cause has dissipated between the time of seizure and analysis. <u>Id.</u>, p. 12 (citing <u>United States v. Brewer</u>, 588 F.3d 1165, 1172-73 (8th Cir. 2009)). Likewise, Special Agent Phill's inadvertent failure to timely return the warrants did not violate the Fourth Amendment and did not support suppression. <u>Id.</u>, p. 13 (citing <u>United States v. Gerald</u>, 5 F.3d 563, 566-67 (D. C. Cir. 1993)).

Finally, the Government contended that Cheung's alleged failure to comply with BCA protocol could not provide a basis for suppression, noting that Dahl cited no

authority for his theory that violation of an internal agency policy results in suppression of evidence.  Id., p. 14.

      **A.**      **Elmore Truck and Trailer Search Warrant**

The Fourth Amendment protects the "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." This right "is preserved by a requirement that searches be conducted pursuant to a warrant issued by an independent judicial officer" and supported by probable cause. California v. Carney, 471 U.S. 386, 390 (1985).  Unless an exception exists, a search must not exceed the scope authorized by the warrant.  Horton v. California, 496 U.S. 128, 140 (1990).  A search is within the scope of a warrant if it is consistent with the warrant's parameters.  See Walden v. Carmack, 156 F.3d 861, 873 (8th Cir.1998); cf. McClendon v. Story County Sheriff's Office, 403 F.3d 510, 517 (8th Cir. 2005) ("[O]fficers executing a search warrant are not obliged to interpret it narrowly.") (quotation omitted).

"The Fourth Amendment requires a showing of probable cause before a search warrant may be issued."  United States v. Williams, 477 F.3d 554, 557 (8th Cir. 2007). In addition, "[p]rohibiting the issuance of general search warrants, the Fourth Amendment requires that a search warrant describe and identify the items to be seized with particularity."  United States v. Cartier, 543 F.3d 442, 447 (8th Cir. 2008) (quoting United States v. Nieman, 520 F.3d 834, 839 (8th Cir.2008)).  There is no requirement in this Circuit that a search warrant for computer files contain a search protocol to be valid under the Fourth Amendment.  Id. (noting that defendant's argument that the absence of a computer search strategy rendered a warrant invalid has been "widely rejected" in

other circuits) (citing <u>United States v. Comprehensive Drug Testing, Inc.</u>, 513 F.3d 1085, 1108 (9th Cir. 2008) (while a warrant may arguably provide for a less invasive search, the requirement of a "pinpointed computer search, restricting the search to an email program or to specific search terms, would likely have failed to case a sufficiently wide net to capture the evidence sought."); <u>United States v. Khanani</u>, 502 F.3d 1281, 1290 (11th Cir. 2007) (absence of written search protocol did not render the search warrant overbroad); <u>United States v. Hill</u>, 459 F.3d 966, 977–978 (9th Cir. 2006) (rejecting the argument that a warrant was invalid because it did not include protocols to limit officers' discretion as to what they could examine on the computers and noting that perpetrators will attempt to save files using names not obviously associated with the crimes at issue), <u>cert. denied</u> 549 U.S. 1299; <u>United States v. Brooks</u>, 427 F.3d 1246, 1251–52 (10th Cir. 2005) (the warrant need not include a search protocol to satisfy the particularity requirement of the Fourth Amendment and defendant failed to suggest how the search would have been different with a scripted search protocol)).

In <u>Cartier,</u> the defendant complained that the lack of a search strategy resulted in the government's access to computer files unrelated to his criminal case when it seized and searched his thirteen computers.  543 F.3d at 447.  The Eighth Circuit noted that the defendant failed to allege that he was prejudiced by the search of any of the unrelated files, nor did he allege that any unrelated files were actually searched.  <u>Id.</u> Rather than adopt a blanket finding that the lack of a search protocol renders a search warrant of a computer invalid, the Eighth Circuit stated that the "standard used to gauge the particularity requirement of a search warrant is one of  'practical accuracy' rather

than a hypertechnical one." Id. (quoting United States v. Summage, 481 F.3d 1075, 1079 (8th Cir.2007), cert. denied, 552 U.S. 1104 (2008)).

The warrant for search at Elmore Truck (Gov't Ex. 1) authorized a search for the following:

> Any and all documents relating to employment files and payroll. These documents shall include but are not limited to: timecards, W-2s, check ledgers, check/paystubs, payroll ledgers, driver log books, and unemployment files/forms. In addition, all computer hard drives or other media storage devices used by DTI employees that may include documents and information sought in the above forms. These devices may be external hard drives, thumb drives, disk drives, data disks, data cards or flash drives. All people's names, dates of birth, addresses, and telephone numbers associated with any recovered documents as well as for all present and past employees of DTI should also be provided to Special Agent Phill.

Gov't Ex. 1.

This Court concludes that the warrant was sufficiently particular to satisfy the Fourth Amendment. Supported by a detailed affidavit, the warrant described both the place to the searched (Elmore Truck and computer hard drives and other media storage devices located at Elmore Truck) and the items to be located. It was significant to this Court that Dahl could not identify any computer file that the Government actually examined that exceeded the scope of the warrant. Linda Dahl's testimony that there may have been a personal letter "here or there," farm records, Elmore Truck records or other Dahl trucking business records on the computer not itemized in the warrant does not establish that these documents were actually examined by law enforcement. But even if they were examined, that conduct would not render the search constitutionally

invalid. It is a fact of life that computers contain copious amounts of data, some of which will be within the scope of a warrant and some of which will not.

Further, the fact that no search terms were used to search the files or that the computers may have contained information outside the scope of the warrant, does not render the entire search and seizure unconstitutional. The Eighth Circuit has not mandated a particular search protocol for computers, and other courts to consider the issue have similarly taken a common-sense approach, allowing for the cursory search and opening of files to determine if they contain evidence within the scope of the warrant. See Cartier, 543 F.3d at 447; see also Richards, 659 F.3d 527, 540 (6th Cir. 2011) ("so long as the computer search is limited to a search for evidence explicitly authorized in the warrant, it is reasonable for the executing officers to open the various types of files located in the computer's hard drive in order to determine whether they contain such evidence"); United States v. Burgess, 576 F.3d 1078, 1092 (10th Cir. 2009) ("a computer search may be as extensive as reasonably required to locate the items described in the warrant based on probable cause.") (citations omitted). While it certainly would have been preferable if Cheung had followed the BCA's detailed protocol for the search of the computer records, his failure to do so does not mandate suppression of the evidence seized from the search. The point is that Special Agent Phill, Cheung and Schwieters were all consistent in their testimony that they knew what to examine on the computers. See, e.g., September 9, 2013 Tr., p. 39; October 7, 2013 Tr., pp. 12, 54, 57.

As for Dahl's argument that suppression is required because documents were seized from Elmore Truck and the warrant allowed only seizure of documents from Dahl

Trucking, that contention ignores the fact that the warrant was for the computers located on the <u>premises</u> of Elmore Truck.  Gov't Ex. 1.  Linda Dahl testified, and Dahl did not dispute that the two businesses are located in the same place.  September 9, 2013 Tr., p. 61.  Moreover, while it is true that the focus of the affidavit was on the conduct at Dahl Trucking, and the warrant listed certain types of Dahl Trucking documents to be found on the premises of Elmore Truck, Dahl presented no evidence that Elmore Truck documents outside the scope of the warrant were actually examined.  Nevertheless, even if Elmore Truck computer records were seized and examined, the remedy is suppression of those records and not wholesale suppression of all documents and records obtained based on the warrant.

As the Eighth Circuit has observed:

> [h]owever, as we stated in <u>United States v. Decker</u>, '[t]he Supreme Court, however, has expressly dictated that the flagrant disregard standard applies only where the government exceeds the scope of the authorized search in terms of <u>the places searched, and not to cases in which the government indulges in excessive seizures</u>.' 956 F.2d 773, 779 (8th Cir.1992) (citing <u>Waller v. Georgia</u>, 467 U.S. 39, 43 n. 3, 104 S.Ct. 2210, 81 L.Ed.2d 31 (1984)).  When officers unlawfully seize certain items but do not flagrantly disregard the limits of the warrant by unreasonably searching unauthorized places, "there is certainly no requirement that lawfully seized evidence be suppressed as well." <u>Waller,</u> 467 U.S. at 43 n. 3, 104 S.Ct. 2210.  Accordingly, we affirm the district court's rejection of this argument as there was no flagrant disregard of the limits of the warrant.

<u>United States v. Tenerelli</u>, 614 F.3d 764, 771 (8th Cir. 2010) (emphasis added).

In sum, no evidence was presented to suggest that the executing officers searched any "places" not permitted by the warrant.  To the contrary, the warrant

allowed them to search the computers located at Elmore Truck and that is what law enforcement did. And the fact that the computers seized contained information and records not itemized by the warrant does not dictate the suppression of the records that were listed in the warrant.

This Court also rejects Dahl's argument that all evidence must be suppressed because it took the Government longer than ten days to analyze the contents of the computers. The Fourth Amendment prohibits the execution of a stale warrant. Brewer, 588 F.3d at 1173 (citation omitted). A warrant becomes stale if the information supporting the warrant is not "sufficiently close in time to the issuance of the warrant and the subsequent search conducted so that probable cause can be said to exist as of the time of the search." United States v. Palega, 556 F.3d 709, 715 (8th Cir. 2009) (quoting United States v. Wagner, 989 F.2d 69, 75 (2d Cir.1993)). "Important factors to consider in determining whether probable cause has dissipated ... include the lapse of time since the warrant was issued, the nature of the criminal activity, and the kind of property subject to the search." United States v. Gibson, 123 F.3d 1121, 1124 (8th Cir. 1997). Once a clone of the hard drive and server has been made within the ten-day period, "there [is] no danger that probable cause ceased to exist during the search of the hard drive." Triumph Capital Group, 211 F.R.D. at 66 (citations omitted).

The undisputed evidence is that the computers were seized, the drives and servers copied and the computers returned within six days. That the subsequent search and analysis of the computer files took longer than 10 days is not a Fourth Amendment violation and does not warrant suppression.

The Court also finds no support for Dahl's assertion that suppression is required because Special Agent Phill inadvertently failed to timely return the warrants within the time prescribed by Minnesota statute. "'[F]ederal courts do not suppress evidence seized by state officers in conformity with the Fourth Amendment because of state law violations.'" United States v. Kelley, 652 F.3d 915, 916 (8th Cir. 2011) (quoting United States v. Appelquist, 145 F.3d 976, 978 (8th Cir. 1998)). "When evidence obtained by state law enforcement officers is offered in a federal prosecution, the legality of the search and seizure is not determined by reference to a state statute, but rather is resolved by [F]ourth [A]mendment analysis." Id. (quoting United States v. Maholy, 1 F.3d 718, 721 fn. 4 (8th Cir.1993) (quotation and citations omitted)).

For all of these reasons, this Court recommends denial of Dahl's motion to suppress the records obtained pursuant to the Elmore Truck warrant.

## B.    Frost Bank Search Warrant

The task of a court issuing a search warrant is "simply to make a practical, common sense decision whether, given all the circumstances set forth in the affidavit. . . including the 'veracity' and 'basis of knowledge' of persons supplying hearsay information, there is a fair probability that contraband or evidence of a crime will be found in a particular place." Illinois v. Gates, 462 U.S. 213, 238 (1983). The duty of the reviewing court is simply to ensure that the issuing court had a substantial basis for concluding that probable cause existed. Id. at 238–39 (citation omitted); see also United States v. LaMorie, 100 F.3d 547, 552 (8th Cir.1996) (citation omitted) ("Our duty as the reviewing court is to ensure that the issuing judge had a 'substantial basis' for concluding that probable cause existed, and we owe substantial deference to the

determination of probable cause by the issuing judge."). As to what this Court should consider when reviewing a search warrant for probable cause, "[w]hen the [issuing judge] relied solely on the affidavit presented to him, 'only that information which is found within the four corners of the affidavit may be considered in determining the existence of probable cause.'" United States v. Solomon, 432 F.3d 824, 827 (8th Cir. 2005) (citation omitted).

Apart from a blanket and unsupported statement that the Frost Bank warrant was unsupported by probable cause, Dahl offered no further argument regarding the Frost Bank warrant.

The affidavit in support of the Frost Bank warrant described that DEED had received credible information from an informant, who had worked for Dahl Trucking for over four years, that the Dahls employed 35 to 40 people in the trucking and vehicle sales business and about 30 to 35 people as truck drivers making grain deliveries in Minnesota, Iowa, Kansas and Nebraska. Gov't Ex. 3, p. 2. The informant explained that Dahl Trucking was defrauding the State of Minnesota by annually laying off employees in the winter, encouraging them to collect unemployment and then paying them "under the table" until they were rehired in the spring. Id. Dahl Trucking paid the drivers in a small "official" check well below their normal wages. Id. This check reflected deductions. Id. Dahl then issued a second check much larger than the "official" check. Id. The informant was told that this practice would protect the drivers from child support payments and garnishments because the child support withholding and garnishments would be based on the smaller amounts. Id., pp. 2-3. The informant later learned that Dahl benefited from this fraud more than anyone. Id., p. 3. Dahl "did

not pay taxes, unemployment, or social security on millions of dollars paid to drivers and he took a large cut of the driver's earning[s] from unreported check because he knew they could not complain." Id., p. 3. The informant remembered a conversation with Dahl in which Dahl told him "I'm not going to have you guys pulling unemployment without doing some work. You would be sitting home doing nothing." Id. The affidavit stated that "the informant has talked to several other drivers and he believes that [Dahl Trucking] takes $600 to $1000 of[f] the top of each driver's earnings on the unreported check." Id. The informant provided check stubs and payment records that indicated that the informant was paid about $35,000 in 2008, of which 45% was reported as wages and on which taxes were paid and 55% was not reported. Id. Based on the informant's assertion that this calculation applied in varying degrees to over 30 drivers, Special Agent Phill believed there could be up to $7.5 million in unreported wages since 2006. Id.

In light of the informant's statements, the financial nature of Dahl's alleged crime and the fact that Linda Dahl was a co-owner of the business, this Court concludes that the Frost Bank warrant was supported by probable cause.

As for Dahl's other arguments in connection with this warrant, such as Special Agent Phill's failure to make a timely return under Minnesota law and his failure to write a report, for the reasons already described in connection with the Elmore Truck warrant, neither argument provides a basis for suppression of the evidence seized from the Frost Bank. For all of these reasons, the motion to suppress the evidence seized from the Frost Bank warrant should be denied.

### III.     RECOMMENDATION

For the reasons set forth above, it is recommended that:

Defendants' Motion to Suppress Evidence Seized Under Authority of State-Court

Issued Search Warrants [Docket No. 33] be **DENIED.**


Dated: November 15, 2013                    *Janie S. Mayeron*
                                            JANIE S. MAYERON
                                            United States Magistrate Judge


### NOTICE

Under D. Minn. LR 72.2(b) any party may object to this Report and Recommendation by filing with the Clerk of Court, and serving all parties by **NOVEMBER 22, 2013**, a writing which specifically identifies those portions of this Report to which objections are made and the basis of those objections. A party may respond to the objecting party's brief within ten days after service thereof. All briefs filed under this Rules shall be limited to 3500 words. A judge shall make a de novo determination of those portions to which objection is made. This Report and Recommendation does not constitute an order or judgment of the District Court, and it is therefore not appealable directly to the Circuit Court of Appeals.